IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| MICHAEL LAMENSDORF and KATHY LAMENSDORF, Individually as Parents of JOHN HUNT LAMENSDORF, Deceased, and as Personal Representative(s) of the Estate of JOHN HUNT LAMENSDORF, Deceased, <br><br> Plaintiffs, <br><br> v. <br><br> JASON WELIN and PEN PALS PRODUCTIONS, LLC, <br><br> Defendants. <br><br> NES EQUIPMENT SERVICES CORPORATION, <br><br> Crossclaim Plaintiff, <br><br> v. <br><br> PEN PALS PRODUCTIONS, LLC, <br><br> Crossclaim Defendant. | CIVIL ACTION NO. 5:09-CV-424 (MTT) |

## **ORDER**

Plaintiffs Michael and Kathy Lamensdorf bring this action for the wrongful death of their son, John Lamensdorf. This matter is now before the Court on the Motions for Summary Judgment of Defendant Jason Welin (Doc. 114) and Defendant Pen Pals Productions, LLC (Doc. 116), with regard to the Plaintiffs' claims, and the Motions for Summary Judgment of Crossclaim Plaintiff NES Equipment Services Corporation (Doc.

120) and Crossclaim Defendant Pen Pals Productions, LLC (Doc. 165), with regard to NES' Crossclaim against Pen Pals.[1]  Welin's and Pen Pals' motions seeking judgment as a matter of law on the Plaintiffs' claims contain almost identical arguments and, accordingly, will be discussed together.  Similarly, NES' and Pen Pals' Motions on NES' Crossclaim contain related arguments, and they, too, will be addressed together.  For the reasons set forth in more detail below, the Motions are **denied**.

I. FACTUAL BACKGROUND

From 2007 to 2009, Stephen Michael Simon was an undergraduate at New York University taking courses in NYU's filmmaking program.  During his senior year, Simon took two courses, one in Fall 2008 and the other in Spring 2009, titled Advanced Production Workshop I and II, in which students prepare an original movie script.  At the end of the Fall semester, Professor Ezra Sacks approved Simon's script for a film titled "Lovely Lying Lips," which would also serve as Simon's senior thesis film project, for production the following semester.

Pen Pals Productions, LLC, is a Georgia limited liability company formed by Stephen Robert Simon, Simon's father, in March 2008.  According to Stephen Robert Simon, after his son told him that he was going to be creating a film for school and that he would be soliciting contributions for the film, Stephen Robert Simon formed Pen Pals in order to account for funds.  Stephen Robert Simon also opened a bank account in Pen Pals' name.  Simon and his mother, Marcia, were the "organizers" of Pen Pals, Stephen Robert Simon served as the registered agent, and Simon's parents' home

---

[1] Pen Pals' insurer, North American Specialty Insurance Company, has filed a declaratory judgment action and that matter is also before the Court on various motions for summary judgment.  *North American Specialty Ins. Co. v. Pen Pals Production, LLC, et al.,* 5:10-CV-191(MTT).  An order disposing of those motions has also been entered today.

address in Gainesville, Georgia, served as Pen Pals' principal and registered address. (Stephen Robert Simon Dep. at 24-27). Although it is not clear what specific activities and responsibilities were undertaken by Pen Pals as an entity, it is clear that, at the very least, Pen Pals was a "stamp" that Simon put on his films to make them appear more professional if his films were ever presented at film festivals.[2] (Simon Dep. at 64).

In Spring 2009, Simon began assembling a cast and crew to help make "Lovely Lying Lips." NYU encourages its undergraduate film students to volunteer to serve as crew members on other students' films in order to gain practical experience with film production. Before his film had even been approved, Simon knew that, if his film were to be "green-lit," he had two key crew members already lined up from his previous film, "When Sharks Die." These two crew members were Rachel Fung, who would serve as Producer, and Andrew White, who would serve as Director of Photography and, in that capacity, would handle all issues related to lighting on the film.

In addition to Fung and White, John Lamensdorf, a student in Simon's Advanced Production Workshop course, and numerous other NYU students volunteered to help Simon with his film. Lamensdorf, like Fung and White, had helped Simon with his previous film. Fletcher Wolfe, a recent NYU graduate with considerable film experience, agreed to work as a "gaffer," or head electrician, and, in that capacity, would operate an aerial lift in connection with White's duties as Director of Photography.

Because this was a student film, and because most of the production costs came out of Simon's pocket, none of Simon's classmates were to be paid for their work on his film. This was common knowledge to the student volunteers—Simon never told anyone

---

[2] In Spring 2008, Simon directed his first "full-fledged" film, entitled "When Sharks Die." "When Sharks Die" was the first, and only other, film to bear the Pen Pals Productions, LLC "stamp." (Simon Dep. at 203).

-3-

that they would be paid for their work and no one ever asked. (Simon Dep. at 63-64). In total, approximately 33 people agreed to assist Simon with his film. The cast and crew consisted almost entirely of NYU students and alumni, Simon's friends from home, and high-school students from various high schools in the Gainesville area. (Simon Dep. at 75).

When he was assembling the cast and crew for his film, Simon never mentioned anything about Pen Pals to his NYU classmates. Although several of his classmates knew that he had created the production company, with regard to "Lovely Lying Lips," the company was never explicitly referenced. (Simon Dep. at 64).

During spring break of his senior year, Simon began looking for potential locations in Georgia to shoot his film. "Lovely Lying Lips" was a horror/thriller film and Simon needed locations that suited the particular scenes from his script, many of which were night scenes. After much deliberation, Simon decided to shoot a substantial portion of his film at an abandoned house just outside of Monticello, Georgia, in Jasper County.

Approximately a month before leaving New York for Georgia to shoot the film, Wolfe, the gaffer who originally volunteered to work on Simon's film, secured a paying job and no longer was able to work on the film. Simon, Fung, and White all discussed the issue and decided to find someone in Georgia with aerial lift experience who would volunteer to work for free. (Simon Dep. at 65). Fung drafted and posted a Craigslist ad, which read: "NYU Thesis film shooting in Georgia is urgently looking for a condor operator/gaffer for two overnight shoots in Monticello. Dates of shoot are May 27 and

May 28…. Compensation: Pay is negotiable; accommodation will be included." (Doc. 116-9).

Defendant Jason Welin responded to the Craigslist ad with his email address and résumé. Welin lived in the Atlanta area and had some experience in film and music production. According to Welin, Fung and Simon responded to his email and hired him to work on the film site for the two days they would spend in Monticello. After some discussions, Welin agreed to work for "credit and copy," meaning that he would not be paid for his work, but that his name would appear in the credits for the film and he would receive a free copy of the completed film. (Simon Dep. at 71-72). Also, as part of the agreement, Simon agreed to reimburse Welin for miscellaneous expenses up to $300.00. (Simon Dep. at 66). Again, like the other crew members who agreed to work on Simon's film, there was no mention of Pen Pals at the time Welin agreed to join the crew. (Welin Dep. at 206-07).

In connection with the film, Simon and his crew needed a significant amount of equipment. Because his film was formally approved by Professor Sacks, and therefore NYU, Simon received a $1,600.00 allotment from NYU and was also allowed to use NYU film equipment. However, NYU did not have everything that he needed, and, to pay for the additional equipment, Simon used funds contributed by his family along with some money he had saved for this particular purpose. Among the equipment he still needed were the items that would be required in order to shoot the night scenes. According to Simon, he delegated the responsibility of the electrical and lighting operations to White, his Director of Photography. White created an extensive list of all

the equipment he would need for the shoot, and Simon assigned Fung and other members of his crew the task of securing the needed equipment.

Before departing for Georgia, Fung rented some of the equipment White requested from Hand Held Films, Inc., a company located in New York. The rental invoices for the Hand Held Films equipment rental identify Stephen Michael Simon and Pen Pals Productions as the "Bill to:" customer. (Simon Dep. at 275). In addition to the equipment from Hand Held Films, once Simon and his crew arrived in Georgia, Fung contacted Production Consultants & Equipment ("PC&E") to secure other necessary equipment, including a 30,000 watt generator to power all the equipment at the site, a truck to tow the equipment to the film site, and various other items. Again, like the invoices from Hand Held Films, the "Bill to:" customer on the PC&E rental and payment forms is listed as "Pen Pals Productions / Stephen Michael Simon." (Simon Dep. at 275-76).

Because Simon provided the credit cards to pay for the equipment, Fung would have the company send the credit card authorization forms to Simon for him to complete and return to the company. Three debit/credit cards (Pen Pals' debit card, Simon's own personal credit card, and Simon's mother's credit card) were used to rent or purchase equipment, insurance, and other necessities, with no discernable rhyme or reason, to Fung at least, as to why a particular card was used for a particular purpose.

Another item White requested was an aerial lift, also commonly referred to as a "boom lift" or "cherry picker," to hoist large light fixtures into the air to simulate moonlight for the nighttime film shots.[3] (Simon Dep. at 37). Simon delegated the task of locating an aerial lift to Nicki Bertsch, the other Producer on the film. Bertsch was a friend of

---

[3] As discussed above, Simon engaged Welin for the specific purpose of operating the aerial lift.

Simon who had recently graduated from the University of Georgia. (Simon Dep. at 72). Bertsch contacted Crossclaim Plaintiff NES Equipment Rental Services Corporation in Stone Mountain, Georgia, through its Branch Manager Tim Schulte.[4] After several emails between Bertsch and Schulte, Bertsch and Simon traveled to NES in Stone Mountain to rent a lift. After a brief demonstration of how to operate the lift, and after Simon told Schulte that he "ha[d] someone who knows how to work [the lift]", Simon completed the rental transaction. (Simon Dep. at 83-84). The specific model of the aerial lift that he rented was a Genie Z45/25RT, which, when fully extended, could reach a height of 45 feet.

The NES Rental Agreement lists only "Stephen Michael Simon" as the "Customer." (Doc. 112-3). Moreover, the credit card authorization form attached to the Rental Agreement lists "Stephen Michael Simon" as the customer, and, by all accounts, all rental fees associated with the aerial lift were billed to Simon and paid for by Simon with his personal credit card. (Simon Dep. at 176-77). Although only Simon's name appears on the Rental Agreement as the customer and there is no mention of Pen Pals anywhere in the contract, according to Simon, "[w]hen [he] rented the lift from NES for filming Lovely Lying Lips, [he] did so as a member of Pen Pals and as the director of the Pen Pals film, Lovely Lying Lips." (Simon Aff. ¶ 11). The Rental Agreement was signed by Raquel Cedar, the Art Director for the film, who was the only crew member present at the Monticello film site when the lift was delivered by NES employee Jesse Neese. The Rental Agreement provided, in pertinent part, that the "[s]igner agrees that he/she

---

[4] The Plaintiffs originally brought suit against NES, but those claims have been settled, and NES was dismissed as a Defendant on February 17, 2011. (Doc. 132).

is authorized to bind the Customer to the terms and conditions on the reverse side hereof."

The Rental Agreement contained several other details of particular relevance to this action. Directly below Cedar's signature, the Rental Agreement provided: "PLEASE NOTE THAT THERE ARE IMPORTANT TERMS ON THE REVERSE SIDE OF THIS CONTRACT, INCLUDING AN INDEMNIFICATION PROVISION." The indemnification provision reads as follows: "Customer agrees to fully indemnify and hold harmless [NES] against any and all costs, claims, demands, or suits, pending or threatened (including costs of defense, attorney's fees, expert witness fees, investigation and all other costs of litigation) for any and all bodily injury, death, destruction, property damage, or any other costs, damages or loss, regardless of whether such injury, death, destruction, damage or loss is caused in whole or in part by negligence, which in whole or in part, arise out of, result from, or relate to the use, operation, condition, or presence of the Equipment…." The Rental Agreement also required the customer to carry at least $1,000,000.00 in commercial general liability insurance, naming NES as an additional insured, to cover the above indemnity obligations.

Because of all the equipment that Simon and his crew rented for the film, they were also required to procure insurance to cover any loss or damage that may potentially occur.[5] NYU provided basic insurance for students producing films in connection with the school. The NYU insurance plan included coverage for bodily injury to others, damages to property of others, damages to NYU property, workers' compensation, and negative insurance. (Doc. 114-3). According to Simon and Fung, in

---

[5] The precise source of this requirement is not clear. Email correspondence between Fung and NYU employee Christina DeHaven suggests that NYU required insurance coverage, which certainly would be prudent. (Doc. 114-9). The point, however, is that Fung thought insurance was required.

Spring 2009, NYU changed its insurance plan and no longer provided insurance for third-party equipment rentals used on student film shoots. (Simon Dep. at 45). Consequently, Fung contacted Film Emporium, a company located in New York that provides insurance coverage for entertainment companies. According to Fung, she went to Film Emporium "purely to fill the gap of what insurance [they] weren't getting from NYU." (Fung Dep. at 143).

Because of the unusual nature of this project, Film Emporium, in turn, submitted the application for coverage to North American Specialty Insurance Company. North American ultimately issued a Commercial General Liability policy to Pen Pals that would cover the production of the film "Lovely Lying Lips" for the period of May 22 to June 4, 2009. (Doc. 170-11). "Pen Pals Productions" is listed as the "Named Insured" on the North American policy. However, Simon appears to have paid the premiums on the policy using his personal credit card. (Doc. 167-8). According to Simon, "[he] expected that this insurance would cover injuries resulting from the use of third-party rental equipment, including the lift rented from NES." (Simon Aff. ¶ 19). Furthermore, no party contests the fact that NES is not named as an additional insured in the North American policy.

On May 27, 2009, the film crew began filming at the abandoned house in Monticello, Georgia. The schedule for the shoot was set by Simon, and called for filming to take place each day from May 27 to June 2, 2009. (Doc. 116-13). That same day, NES employee Jesse Neese delivered the aerial lift to the film site. Because of the remote location of the film site, Neese asked Tim Schulte, NES Branch Manager, generally, who was the recipient of the delivery so that Neese would have a better

understanding of the location he was looking for.  Based on Schulte's response, it was Neese's understanding that he was delivering the aerial lift to a "movie company." (Neese Dep. at 71-72).  As noted above, when Neese arrived with the aerial lift in Monticello, Art Director Raquel Cedar was the only crew member present.  Neese unloaded the lift, had Ms. Cedar sign the Rental Agreement accepting delivery, and left the property.

After a day of filming on May 27, the film crew returned to the Monticello film site on the afternoon of May 28, 2009 to set up for filming scenes that night.  Some time that day, the generator used to power all of the equipment on the site malfunctioned, and a repairman from Jasco Plumbing was called out to the film location to do repairs.  The invoice from Jasco lists "Pen Pals Productions" as the customer.

In preparation for the nighttime film shoot, Welin, White, Lamensdorf, Andres Cardona, and Brian Streem began maneuvering electric cables throughout and around the abandoned house, and Welin moved the aerial lift into position for the shoot. Around this time, Welin and several others, including White, Cardona, and Streem, noticed some overhead power lines near where the aerial lift was positioned.  In order to avoid contact with the wires, the four decided to have Cardona on the ground directing Welin's movement of the aerial lift.  Attached to the metal rail of the lift platform was a metal stand holding two large items: (1) a 12,000 watt spotlight to illuminate the front area of the house; and (2) a diffuser frame, which is a 4' x 6' metal frame with a  piece of silk stretched side to side, to diffuse the intense light from the spotlight.  The spotlight was, along with the other equipment being used at the time, connected to the generator.

While Welin and Cardona were getting the aerial lift into position, John Lamensdorf was setting up lights behind the house. The lights Lamensdorf was positioning were also connected to the generator. With Cardona guiding Welin's positioning of the lift, the aerial lift accidentally made contact with the overhead power lines, causing an electrical surge to flow from the frame to a distribution box on the ground, to the generator, and then to the lights Lamensdorf was working on behind the house, which were also connected to the generator. According to accident reports, Lamensdorf was touching a metal light frame at the time of the surge and received a fatal electrical shock. His electrocution and death occurred between 10:00 and 11:00 p.m. on the night of May 28, 2009.

## II.     DISCUSSION

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). The burden rests with the moving party to prove that no genuine issue of material fact exists. *Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d at 1224. The district court must "view all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor." *Id.*

### A. Welin's and Pen Pals' Motions for Summary Judgment on the Plaintiffs' Claims

Welin and Pen Pals assert that the Plaintiffs' claims are barred by the exclusive remedy provision of the Georgia Workers' Compensation Act, O.C.G.A. § 34-9-1, *et seq.* (the "Act"). Pen Pals also argues that Welin was an employee of Simon, rather than Pen Pals, and therefore Pen Pals is not vicariously responsible for Welin's negligence. Pen Pals' argument that Simon was somehow distinct from Pen Pals for purposes of employer vicarious liability is difficult to follow. However, it is not necessary to discuss this issue in any detail because it clearly cannot be decided as a matter of law that Simon, rather than Pen Pals, employed Welin. Welin's and Pen Pals' argument that the Act bars the Plaintiffs' claims requires more discussion.

In Georgia, when an "employee" suffers an on-the-job injury, the rights and remedies of the injured employee are generally governed by the Act. Under section 34-9-11(a), also known as the exclusive remedy provision of the Act, "[t]he rights and remedies granted to an employee by [the Act] shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents, or next of kin, at common law or otherwise, on account of such injury, loss of service or death." This provision acts to prevent an injured employee from bringing a tort action against his or her employer or any co-employee of the same employer. "The rationale for this exclusion is a trade-off or quid pro quo between employer and employee. The employer is insulated from direct common law tort liability in exchange for providing the whole array of workers' compensation benefits to the employee regardless of any negligence involved in any accidental injury. The employee forgoes his common law rights,

including claims for pain and suffering, in exchange for this broad workers' compensation coverage." Charles R. Adams III, *Georgia Law of Torts*, § 7-7 (2010-2011 ed.).

For the exclusive remedy provision of the Act to apply, there must, of course, be an "employer." The Act defines "employer" to include "any individual, firm, association, or public or private corporation engaged in any business…." O.C.G.A. § 34-9-1(3). However, section 34-9-2(a)(2) limits the scope of this definition by providing that "[the Act] shall not apply to any person … that has regularly in service less than three employees in the same business within this state." Thus, for there to be an "employer" for purposes of the Act, one must be "engaged in any business" and have at least three employees "regularly in service" within the state of Georgia. The word "regularly," as used in the statute, is not synonymous with "constantly" or "continuously," but instead refers to the question of whether the employment of such number "is or is not in an established mode or plan in the operation of the business, and has no reference to the constancy of the occurrence." *Employers Liability Assur. Corp. v. Hunter*, 184 Ga. 196, 190 S.E. 598, 600-01 (1937).

The Act defines "employee" to include "every person in the service of another under any contract of hire or apprenticeship, written or implied, except a person whose employment is not in the usual course of the trade, business, occupation, or profession of the employer…." O.C.G.A. § 34-9-1(2). The test for determining whether a party is an "employee" under the Act is "whether an employment is in furtherance of the business of the employer, and not in the manner or method adopted in the performance of such employment." *Lee v. Claxton*, 70 Ga. App. 226, 228, 28 S.E.2d 87, 88 (1943).

Welin and Pen Pals contend that the Plaintiffs' claims against them are barred by the Act because Welin and John Lamensdorf were co-employees of the same employer. As explained in detail below, the Court finds that, under the unique facts of this case, it cannot be determined as a matter of law that there exists an "employer" as that word is defined by the Georgia Workers' Compensation Act.

To qualify as an employer, Simon or Pen Pals must have been engaged in a business and he or Pen Pals must have employed at least three employees in the ordinary course of that business.[6] At all times relevant to this action, Simon was a full-time college student at New York University.[7] "Lovely Lying Lips" was Simon's senior thesis film project, and was being produced, for the most part, by NYU students with little practical experience in film production, as a requirement for their Advanced Production Workshop II course. In short, the filming of "Lovely Lying Lips" was nothing more than a school project, and, generally speaking, a student engaged in a project for a class can hardly be an "employer."

On the other hand, the production of "Lovely Lying Lips" was no small venture. Simon and his crew spent several weeks drafting a script, obtaining all necessary equipment and insurance, scouting potential locations for the film shoot, securing funding, and myriad other tasks necessary for the production of any film, whether amateur or professional. Moreover, Simon had amassed a budget of over $30,000.00 and, if the shoot was successful, hoped to present "Lovely Lying Lips" at film festivals.

---

[6] As noted, Pen Pals also contends Simon and Pen Pals were separate employers for the purpose of determining vicarious liability for Welin's negligence. The point of this discussion, however, is to examine whether there existed an employer as defined by the Act. In this regard, it makes no difference whether the alleged employer was Simon or Pen Pals.

[7] Apparently, Simon had finished his course work and might have moved back to Georgia, but he had not yet graduated. In order to receive a grade in Advanced Production Workshop II, Simon was required to screen his film.

The facts here are unusual, and the Court is unaware of any reported case that directly applies. In most cases, it is undisputed that the "employer" is "engaged in any business," and the focus, instead, is on whether the employer has regularly in service the requisite number of employees. See *Crisp Regional Hosp. v. Oliver*, 275 Ga. App. 578, 621 S.E.2d 554 (2005) (employer was a hospital); *Studdard v. Phoenix Indem. Co.*, 79 Ga. App. 467, 54 S.E.2d 280 (1949) (employer was an airline); *McDonald v. Seay*, 62 Ga. App. 519, 8 S.E.2d 796 (1940) (employer was a sawmill). This case is different, and the Court is unable to rule as a matter of law that Simon, a full-time college student producing a film for his senior thesis project, was engaged in a business for purposes of the Act. Although a determination of whether a party is an employer under the Act is, generally, a matter of law capable of resolution by the Court, here, that determination is dependent on the resolution of an issue of fact that that must be resolved by a jury.

The Court is also unable to determine at this time whether Welin and Lamensdorf were "employees," another prerequisite for application of the exclusive remedy provision of the Act. Section 34-9-1(2) of the Act specifically excludes from its definition of "employee" "a person whose employment is not in the usual course of the trade, business, occupation, or profession of the employer…." Because the Court cannot determine as a matter of law whether there is an "employer" as that word is defined by the Georgia Workers' Compensation Act, and based on the limiting provision contained in the definition of "employee," not until that issue is resolved can it be established whether Welin or any other "Lovely Lying Lips" volunteer was an employee under the Act.

The Lamensdorfs also argue that their son was acting under the supervision of White rather than Simon and therefore their son was not an employee of Simon. They make a similar argument in the declaratory judgment action to avoid the policy exclusion for employee injuries. Specifically, they argue that their son was essentially an employee of Andrew White rather than Pen Pals and therefore their son and Welin were not co-employees of the same employer. This is a problematic argument for the Lamensdorfs for several reasons, not the least of which is that Welin was also acting under the direction of White. If the Lamensdorfs' argument that White was essentially a separate employer is correct, then it is difficult to see how Pen Pals can be vicariously liable for Welin's negligence.

Moreover, with regard to John Lamensdorf, there is scant evidence in the record that he was an employee of anyone and certainly there is not sufficient evidence to conclude as a matter of law that he was an employee as that term is defined in the Act. While the payment of wages is not necessary to make one an employee under the Act, a "person performing, for his own pleasure and accommodation, a gratuitous service for another person at the request or suggestion of such other person is not an 'employee' or 'servant' of such person and is not entitled to compensation for an injury received while performing the service." *Jones v. Lumbermens Mut. Cas. Co.*, 58 Ga. App. 713, 713, 199 S.E. 832, 832 (1938). The parties have adduced sufficient evidence to demonstrate that Welin, although not paid monetary compensation, nevertheless was not providing a gratuitous service. With regard to John Lamensdorf, however, the Court is not able to conclude, as a matter of law, that he was an employee as that term is defined by the Act.

Accordingly, for the reasons set forth above, Welin's and Pen Pals' Motions for Summary Judgment (Doc. 114 and Doc. 116, respectively) are **DENIED**.

## B. NES' and Pen Pals' Motions for Summary Judgment on NES' Crossclaim

NES and Pen Pals have both filed Motions for Summary Judgment on NES' Crossclaim against Pen Pals. NES asserts that Simon rented the aerial lift on behalf of Pen Pals, and that pursuant to the Rental Agreement, Pen Pals is obligated to indemnify NES for all costs associated with defending against the underlying suit brought by the Plaintiffs and for any settlement payments made by NES to the Plaintiffs. NES also claims that Pen Pals breached the terms of the Rental Agreement by failing to name NES as an additional insured on the CGL policy purchased from North American.

In response, Pen Pals claims that Simon rented the aerial lift from NES in his individual capacity, rather than as an agent of Pen Pals, and therefore Simon, not Pen Pals, is the "customer" on the NES Rental Agreement. As a result, Pen Pals contends that because it was not a party to the Rental Agreement, it is neither obligated to indemnify NES nor was it required to name NES as additional insured on the North American policy. In short, resolution of NES' Crossclaim is possible only after it is determined whether Simon or Pen Pals is the customer on the NES Rental Agreement.

Pen Pals argues that the Rental Agreement is clear and unambiguous with regard to who the customer is and therefore the Court should not consider evidence extrinsic to the Rental Agreement. As a general proposition, Pen Pals is correct. However, when the issue is the capacity of a contracting party, extrinsic evidence is admissible. Under Illinois law,[8] "the signature of a corporate officer may be effective as

---

[8] Section 14 of the Rental Agreement contains a choice of law provision stating that Illinois law shall govern the Rental Agreement.

the signature of the corporation, even if the officer fails to indicate his corporate affiliation." *City of Prospect Heights v. Village of Wheeling*, 498 N.E.2d 601, 603 (Ill. App. 1986).

> The general rule is that a contract by a corporate officer or agent need not be made and signed in the name of the corporation to render the corporation liable thereon, if it was the intention of the parties to bind the corporation. In determining whether it is the intention of the parties to bind the corporate principal or to bind the purported agent individually, all of the facts and circumstances surrounding the making of the contract are properly considered by the court.

*Id.* (quotations and internal citations omitted).

The intention of the parties is a question of fact, and "[w]here the language used leaves the true intent of the parties in doubt and it is necessary to receive evidence of extrinsic facts and circumstances to determine the intent of the parties, and if such extrinsic facts and circumstances are controverted, then the jury must determine the question of fact." *Bertlee Co. v. Illinois Publ'g & Printing Co.*, 52 N.E.2d 47, 55-56 (Ill. App. 1943).

Here, the extrinsic facts and circumstances surrounding the intentions of the parties to the Rental Agreement are in dispute and therefore must be resolved by a jury. On the one hand, the Rental Agreement lists only "Stephen Michael Simon" as the customer and the section of the Rental Agreement titled "Business Information" is left blank. In addition, all fees associated with the rental of the aerial lift were billed to and paid for by Simon with his own personal credit card.

However, according to Simon, "when he rented the lift from NES … [he] did so as a member of Pen Pals and as director of the Pen Pals film, Lovely Lying Lips." There is also evidence that equipment rented from Hand Held Films and PC&E was rented by

Pen Pals, rather than Simon individually, and that the repair work performed on the generator by Jasco was billed to Pen Pals, thus suggesting that it may have been Simon's intention to bind Pen Pals when he rented the aerial lift from NES. Moreover, according to Simon, Fung obtained the policy from North American in Pen Pals' name specifically for the purpose of covering claims arising from the use of third-party rental equipment, including the aerial lift rented from NES. Given that the policy was purchased by Pen Pals in its own name for the express purpose of covering third-party equipment rentals, why would Simon have rented the lift from NES in his individual capacity, effectively excluding the NES equipment from coverage under the North American policy? According to Simon, he would not have.

In short, extrinsic evidence is admissible to show who the actual customer is on the Rental Agreement. Because this evidence is controverted, there exists a question of fact that must be presented to the jury. Further, because NES' claim that Pen Pals breached the Rental Agreement by failing to name NES as an additional insured on the policy is dependent on a finding that Pen Pals was the customer on the Rental Agreement, that issue, too, must be resolved at trial. Accordingly, NES' and Pen Pals' Motions for Summary Judgment (Doc. 120 and Doc. 165, respectively) are **DENIED**.[9]

---

[9] NES has also filed a Motion to Strike Pen Pals' Reply Brief (Doc. 173), claiming that Pen Pals' Reply (Doc. 172) filed in support of its Motion for Summary Judgment was untimely and impermissibly advanced arguments not previously raised in the briefing on NES' Crossclaim. Because Pen Pals' Motion for Summary Judgment would have been denied regardless of whether the Court's considered Pen Pals' Reply brief, NES' Motion to Strike is **DENIED as moot**.

### III. CONCLUSION

For the reasons set forth above, the Motions for Summary Judgment (Docs. 114, 116, 120, and 165) are **DENIED**.

**SO ORDERED,** this 17th day of May, 2011.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT